## Sano v. Globe Rubber Products Corp.

*Benjamin Pomerantz,* for claimant.

*Maurice Levan,* Special Assistant Attorney General, and *E. S. Lawhorne,* for defendants.

LEVINTHAL, J., January 23, 1958.—Claimant sustained accidental injuries in the course of his employment on January 25, 1954, when he fell from a scaffold 25 feet to the pavement below. The original agreement, under which he received compensation for total disability beginning February 1, 1954, recited the following injuries: Fractures of the left arm, left leg, nose, frontal and maxillary bones and contusions of the skull.

Beginning March 7, 1955, claimant's compensation was reduced by a supplemental agreement which recites a report by Dr. Henry S. Orloff that claimant was then only 50 percent disabled. Thereafter, the insurance carrier-defendant petitioned the board for an order further reducing claimant's compensation as of March 20, 1956, on the ground that he was then only 25 percent disabled. On August 25, 1956, before any hearings were held on this petition, claimant became bedridden as the result of a "stroke" which paralyzed his left side. Following hearings the referee entered an order denying defendant's petition. The order also awarded claimant compensation for total disability beginning August 25, 1956, the date of the "stroke". Although claimant offered no medical testimony connecting the accidental injuries with the total disability

resulting from the "stroke", and defendant's physician testified that in his opinion there was no connection, the workmen's compensation board affirmed the findings, conclusions and award of the referee. In its opinion there was "a definite, close relationship or connection between the accidental fall and the vascular incident which resulted in recurring total disability on August 25, 1956". Defendant has appealed from the board's decision.

Claimant, who was 60 years old when the accident occurred, and whose memory had been affected adversely by the "stroke", testified as follows: In January 1954, a scaffold upon which he was working slipped or broke causing him to fall on his left side 25 feet to the pavement below. He bled profusely from the head, was rendered unconscious and was removed to Temple University Hospital where X-rays were taken. He sustained fractures of the head, nose, left arm and leg, as well as muscle injuries, and remained in the hospital for two or three months. After his discharge he continued to receive hospital treatment for two or three months as an out-patient. Claimant's own physician, Dr. Taglianetti, has been treating him since the accident. For a time claimant also was treated by defendant's physician, Dr. Orloff, who is a specialist in industrial and internal medicine.

Claimant testified that his head continued to "bother him" after the accident, that he has had headaches since the accident, that his condition became worse all the time and that he suffered no other accidents since the fall. He testified that he was unable to use his left hand, arm and leg in 1954 and 1955, that he was on crutches and in a brace for a year and a half or two, that he regained some use of his arm and leg in 1956, and that commencing April 1956, he began working at odd bricklaying or cement jobs. He continued to have difficulty with his leg, worked with

a pillow under his knees and was unable to obtain regular employment because he no longer was able to climb scaffolds. He earned only $300 or $400 in 1956.

One morning in August 1956, claimant felt a headache and could not get out of bed. He spent five or six weeks at the Germantown Hospital where he was attended first by Dr. Madonna and subsequently by Dr. Taglianetti. He has remained at home in bed since his discharge from the hospital. He complains of pain in the left arm and leg and also of continuing steady headaches.

Dr. Henry S. Orloff, who first examined claimant on March 30, 1954, and who thereafter treated claimant's fractured limbs, testified that he examined claimant on November 14, 1955. He found that the fractures of the left limbs had improved considerably and that claimant was working at that time. His next examination on May 7, 1957, disclosed that claimant was suffering from hemiplegia of the left side of the body involving the left upper and lower extremities, due to apoplexy or rupture of a blood vessel in the brain, and also cardiovascular disease and hypertension. In Dr. Orloff's opinion, claimant's condition at that time was not related to the accidental injury of January 25, 1954. Dr. Orloff's history indicated that claimant had been working on a patio carrying heavy flagstone on or about August 20, 1956. He had suffered from persistent headaches which became very severe during that week. On Sunday, August 25, 1956, when he awoke, claimant was unable to get out of bed and discovered that his left leg and arm were paralyzed.

In the course of his cross-examination, Dr. Orloff testified that he examined claimant on March 20, 1954, when he was still in the hospital, and again on June 15, 1954, after he had returned home, that he treated him from July to September 1954, and from October to December 1954, and that his last examination prior

to May 7, 1957, was on November 15, 1955. On the date of his first examination, Dr. Orloff recommended that claimant be removed from the hospital and given physiotherapy. In June 1954, Dr. Orloff concluded that claimant was still totally disabled, but that he might return to work if he received adequate treatment for about three months. In September 1954, claimant's brace had been removed, but he still had a limp and shortage of the left leg and walked with the support of a cane. In December 1954, claimant showed marked improvement. On November 14, 1955, Dr. Orloff concluded that claimant's disability "should remain status quo, which means 50 percent". Despite the facts that claimant's fractures had improved considerably and he admitted that he was working as a contractor, he complained of inability to work a full day, of pain and weakness in the left hand, and he still had a limp in the left foot. The circumference of the right ankle was eight inches, whereas the left was 13 inches.

Claimant's high blood pressure, 190 over 180, was noted by Dr. Orloff in his examinations of March 1954 and November 1955. As previously noted, claimant was found to be suffering from cardiovascular disease and hypertension in March 1957. Although there was no evidence of a concussion when Dr. Orloff first examined claimant, approximately two months after the fall, he admitted that claimant probably suffered a concussion as a result of the fall. He stated that with high blood pressure, a rupture of a blood vessel in the brain may occur at any time under shock and that claimant could have had a rupture when he fell. However, Dr. Orloff thought that should be eliminated because claimant returned to work. The doctor testified further that while claimant's return to laborious work probably aggravated his condition, a ruptured blood vessel in the brain may occur at any time. Finally,

when asked whether a fall such as claimant had would improve or aggravate his high blood pressure condition, Dr. Orloff answered: "He probably had a clot, it would not be for improvement (sic)". Also, when asked whether a concussion at the time claimant fell would affect his high blood pressure, Dr. Orloff answered: "It would not do him any good. He could have had at that time a ruptured blood vessel".

In affirming the award of the referee, the board held the case to be governed by Malik v. Uniontown, 172 Pa. Superior Ct. 562 (1953), and two subsequent heart cases which followed that decision. Those cases are inapposite since in each of them a physician expressed his opinion that the accidental injuries were contributing factors in the subsequent death or disability. More in point are cases such as Washko v. Ruckno, Inc., 180 Pa. Superior Ct. 606 (1956), where a worker died of a heart attack shortly after being engaged in strenuous activity in the course of his employment. The only medical testimony was that of claimant's physician who testified that the usual kind of heart attack causing sudden death is coronary occlusion, that overexertion could be an instigating factor in causing a coronary occlusion or a ruptured aorta, which also was a possible explanation for the worker's death, but that either could occur spontaneously, and he could not determine what caused the death in the absence of a post-mortem examination.

In that case, the order of the court below reversing the board and entering judgment for defendant was affirmed on the ground that unequivocal medical testimony was required to establish the causal connection. While the Washko decision was distinguished in the recent case of McCleary v. Pennsylvania Electric Company, 184 Pa. Superior Ct. 185 (1957), the evidence in the latter case substantially eliminated other possible causes of death, leaving the accident as the only

reasonable explanation. See also Witt v. Witt's Food Market, 122 Pa. Superior Ct. 557 (1936), where the symptoms of claimant's subsequently diagnosed heart ailment were immediately and continuously apparent after the accident, but not before.

The cases cited by appellee are distinguishable. In Heyler v. J. Sullivan & Sons Manufacturing Corp., 172 Pa. Superior Ct. 615 (1953), the worker, who died of pneumonia, was hospitalized for his condition three days after the accident in which he sustained broken ribs, and a physician gave his professional opinion that the accident was a contributing factor in his death. In Meehan v. City of Philadelphia, 182 Pa. Superior Ct. 161 (1956), claimant was immediately and continuously disabled from a back injury which he sustained in the accident, and his police medical record contained no reference to "hypertension" until almost four months after the injury. Under those circumstances the board was warranted in rejecting defendant's affirmative medical opinion evidence that claimant's disability was due to hypertensive cardiovascular disease, rather than to his back injury. In Diehl v. General Baking Co., 154 Pa. Superior Ct. 33 (1943), affirmed 349 Pa. 235 (1944), where the worker died of a rupture of an aneurysm of the aorta approximately eight months after sustaining compensable rib fractures, a physician testified that in his opinion the accident caused or aggravated the aneurysm. In McCoy v. Spriggs, 102 Pa. Superior Ct. 500 (1931), there was no definite medical testimony connecting the worker's death from apoplexy and his employment, but the "stroke" occurred while he was overexerting himself in the course of his employment.

Although quite different injuries are involved, the present case in many respects is like Anthony v. Lee Coal Company, 168 Pa. Superior Ct. 397 (1951). There, as here, claimant's good faith in asserting a

recurrence of disability from the accident is not questioned, but the subsequent disability may have resulted from any one of a number of causes other than the accident. Since the sequence of events of itself is too tenuous to connect the subsequent disability with the original accident, unequivocal medical testimony of a causal connection between the accident and the paralysis is required.

In this connection it is important to note that the continuing partial disability upon which the board relied was attributable, so far as the record shows, entirely to claimant's fractured limbs. Claimant neglected to produce medical evidence or testimony concerning the nature and extent of the injuries, if any, resulting from the probable concussion, also greatly relied upon by the board, or resulting from the alleged fractures of the nose, frontal and maxillary bones and the contusions of the skull, which are recited in the original agreement between the parties. Instead of producing the records of the various hospitals, the testimony of one or more of the physicians who attended him in connection with his head injuries and "stroke", or the testimony of an expert medical witness, claimant relied upon certain equivocal testimony by defendant's physician, who did not examine claimant until two months after the fall and nine months after the "stroke" and whose sole or principal concern was claimant's fractured limbs. Since claimant and the board erroneously relied upon medical testimony which was not competent to establish the necessary connection between the accident and the "stroke", the proceeding must be referred back to the board for further hearing on the issue of causation.

On rehearing, the board in its discretion may regard the case as calling for the appointment of an impartial medical expert to determine the cause or

causes of claimant's "stroke". See Anthony v. Lee Coal Co., supra.

Appellant's exception concerning the board's failure to reduce claimant's compensation as of March 20, 1956, must be overruled since there was ample evidence to warrant a finding that claimant's 50 percent disability as a result of the accident has not changed.

*Order*

Appellant's first exception is overruled. Appellant's second and third exceptions are sustained. The proceeding is referred back to the board for disposition after further hearing.